COMPLETE FINANCE CORPORATION, SANDIA AUTO ELECTRIC, INC., AND LOMAS WAREHOUSE, INC., NEW MEXICO CORPORATIONS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9266–81.    Filed May 25, 1983.

*Melvin D. Rueckhaus*, for the petitioners.
*William P. Hardeman*, for the respondent.

## OPINION

FEATHERSTON, *Judge*: Respondent determined that petitioners are liable for deficiencies in their Federal income taxes as follows:

| Petitioner | Taxable year ended— | Amount |
|---|---|---|
| Complete Finance Corp | Oct. 31, 1977 | $4,833.77 |
| | Oct. 31, 1978 | 2,250.47 |
| Lomas Warehouse, Inc | Oct. 31, 1977 | 14,797.37 |
| | Oct. 31, 1978 | 11,431.29 |
| Sandia Auto Electric, Inc | Sept. 30, 1977 | 6,347.18 |
| | Sept. 30, 1978 | 3,400.46 |

The issues for decision are:

(1) Whether petitioners constituted a brother-sister controlled group of corporations, as defined in section 1563(a)(2);[1] and

(2) Whether petitioners Lomas Warehouse, Inc., and Sandia Auto Electric, Inc., were entitled to write down their ending inventories for the years in question to reflect the inventories' alleged loss of value due to damaged, shopworn, or imperfect items.

## 1. General Background

All of the facts have been stipulated.

Petitioners in these cases are three New Mexico corporations; each of them had its principal office located in Albuquerque, N.Mex., at the time it filed its petition. Each corporation filed its Federal corporation income tax returns for the years in question with the Austin Service Center, Austin, Tex. Petitioners Complete Finance Corp. (hereinafter Complete) and Lomas Warehouse, Inc. (hereinafter Lomas), computed taxable income on the basis of a taxable year ending October 31. Petitioner Sandia Auto Electric, Inc. (hereinafter Sandia), computed taxable income on the basis of a taxable year ending September 30.

## 2. Controlled Group Issue

Each petitioner had only one class of common stock outstanding. The percentage of direct ownership of common stock in petitioners throughout the period in question was as follows:

---

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the tax years in issue, unless otherwise noted.

| Shareholder | Lomas | Sandia | Complete |
| --- | --- | --- | --- |
| Joseph Chimenti | 14.12% | 20.5% | 5.67% |
| Josina Chimenti | 14.12 | 20.5 | 5.67 |
| Mark Wilson, Sr. | 14.12 | 20.5 | 5.67 |
| Barbara Wilson | 14.12 | 20.5 | 5.67 |
| Bart Chimenti | 10.3 | 3 | 0 |
| Bob Chimenti | 5.73 | 3 | 0 |
| Angela Chimenti | 5.73 | 3 | 0 |
| Mark Wilson, Jr. | 10.3 | 3 | 0 |
| Peggy Wilson | 5.73 | 3 | 0 |
| Patty Wilson | 5.73 | 3 | 0 |
| Lomas | 0 | 0 | 40.59 |
| Sandia | 0 | 0 | 36.73 |
| Totals | 100 | 100 | 100 |

Joseph and Josina Chimenti were married at all times relevant to this case, as were Mark Wilson, Sr., and Barbara Wilson.

Section 1561(a)(1), as in effect for the taxable years at issue, limited the "component members of a controlled group of corporations" to one surtax exemption. This limitation increased the amount of the total taxable income of the controlled group that was subject to the surtax on corporate taxable income.

One type of controlled group of corporations is a brother-sister controlled group, which is defined in section 1563(a)(2) as follows:

(2) BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.[2]

Section 1563(d)(2) provides that:

(2) BROTHER-SISTER CONTROLLED GROUP.—For purposes of determining whether a corporation is a member of a brother-sister controlled group of

---

[2]The final clause of sec. 1563(a)(2)(B) was illustrated in S. Rept. 91–552 (1969), 1969–3 C.B. 423, 510, in part as follows:

"For example, a person who owns 70 percent of one corporation and 30 percent of another corporation is to be treated as owning only 30 percent of each corporation identically. It is only this amount which would be taken into account in applying the 50 percent test."

corporations (within the meaning of subsection (a)(2)), stock owned by a person who is an individual, estate, or trust means—

(A) stock owned directly by such person, and

(B) stock owned with the application of subsection (e).

Section 1563(e), in turn, provides as follows:

SEC. 1563(e). CONSTRUCTIVE OWNERSHIP.—

(4) ATTRIBUTION FROM CORPORATIONS.—Stock owned, directly or indirectly, by or for a corporation shall be considered as owned by any person who owns (within the meaning of subsection (d)) 5 percent or more in value of its stock in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

(5) SPOUSE.—An individual shall be considered as owning stock in a corporation owned, directly or indirectly, by or for his spouse * * * [3]

Respondent has determined that petitioners constituted a brother-sister controlled group during the period in question. We agree, and we so hold. Petitioners satisfied both the 80-percent test and the 50-percent test of section 1563(a)(2). This is made plain in respondent's computations, which are set forth in the notices of deficiency. Respondent's computation for purposes of the 80-percent test is as follows:

*80-Percent test—sec. 1563(a)(2)(A)*

| | *Lomas* | *Sandia* | *Complete* |
|---|---|---|---|
| 1. Joseph Chimenti: | | | |
| Direct ownership | 14.12 | 20.5 | 5.67 |
| Through attribution from wife, Josina | 14.12 | 20.5 | 5.67 |
| Through attribution from Lomas (0.2824 × 0.4059) | 0 | 0 | 11.46 |
| Through attribution from Sandia (0.41 × 0.3673) | 0 | 0 | 15.06 |
| Total—Joseph Chimenti | 28.24 | 41 | 37.86 |
| | | | |
| 2. Mark Wilson, Sr.: | | | |
| Direct ownership | 14.12 | 20.5 | 5.67 |
| Through attribution from wife, Barbara | 14.12 | 20.5 | 5.67 |
| Through attribution from Lomas (0.2824 × 0.4059) | 0 | 0 | 11.46 |
| Through attribution from Sandia (0.41 × 0.3673) | 0 | 0 | 15.06 |
| Total—Mark Wilson, Sr. | 28.24 | 41 | 37.86 |

[3]There are exceptions to the rule of spousal attribution, but they do not apply to this case.

| | | | |
|---|---|---|---|
| 3. Bart Chimenti: | | | |
| Direct ownership | 10.3 | 3 | 0 |
| Indirect through Lomas | | | |
| (0.103 × 0.4059) | 0 | 0 | 4.18 |
| Total—Bart Chimenti | 10.3 | 3 | 4.18 |
| | | | |
| 4. Bob Chimenti: | | | |
| Direct ownership | 5.73 | 3 | 0 |
| Indirect through Lomas | | | |
| (0.0573 × 0.4059) | 0 | 0 | 2.33 |
| Total—Bob Chimenti | 5.73 | 3 | 2.33 |
| | | | |
| 5. Mark Wilson, Jr.: | | | |
| Direct ownership | 10.3 | 3 | 0 |
| Indirect through Lomas | | | |
| (0.103 × 0.4059) | 0 | 0 | 4.18 |
| Total—Mark Wilson, Jr. | 10.3 | 3 | 4.18 |
| | | | |
| Total for 80-percent test | 82.81 | 91.00 | 86.41 |

Respondent's computation for purposes of the 50-percent test is as follows:

*50-Percent test—sec. 1563(a)(2)(B)*

| | Lomas | Sandia | Complete | Identical ownership |
|---|---|---|---|---|
| 1. Joseph Chimenti | 28.24 | 41 | 37.86 | 28.24 |
| 2. Mark Wilson, Sr. | 28.24 | 41 | 37.86 | 28.24 |
| 3. Bart Chimenti | 10.3 | 3 | 4.18 | 3 |
| 4. Bob Chimenti | 5.73 | 3 | 2.33 | 2.33 |
| 5. Mark Wilson, Jr. | 10.3 | 3 | 4.18 | 3 |
| Total for 50-percent test | 82.81 | 91 | 86.41 | 64.81 |

As is apparent from the computations set forth above, respondent's determination that petitioners constituted a controlled group is based on repeated application of the constructive ownership rules of section 1563(e). The stock of Complete "owned" by Bart Chimenti, Bob Chimenti, and Mark Wilson, Jr., was deemed to include not only the shares directly owned by them, but also the shares of Complete attributable to them through their ownership of Lomas. The Complete stock

owned by Joseph Chimenti and Mark Wilson, Sr., was similarly deemed to include both stock owned directly by them and stock owned constructively through their ownership of Lomas and Sandia. Furthermore, the stock owned by Joseph Chimenti and Mark Wilson, Sr., in all three corporations was deemed to include the shares owned by their wives.

Petitioners argue that: "The Commissioner erred in adding 'persons' to his computations who were not direct stockholders in Complete, to wit, Bart Chimenti, Bob Chimenti, and Mark Wilson, Jr." They argue that in *United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982), the Supreme Court "clearly ruled that this creation by the Commissioner of additional 'persons' by attribution alone is not legal." Their reliance on *Vogel Fertilizer*, however, is misplaced.

*Vogel Fertilizer* concerned an alleged brother-sister controlled group made up of two corporations, Vogel Fertilizer Co. (Fertilizer) and Vogel Popcorn Co. (Popcorn). One individual, Vogel, owned 77.49 percent of the stock in Fertilizer and over 80 percent of the stock in Popcorn. A second individual, Crain, who was unrelated to Vogel, owned the remaining 22.51 percent of the Fertilizer stock, but no stock in Popcorn. The Commissioner determined that Fertilizer and Popcorn constituted a brother-sister controlled group, taking Vogel and Crain as the "5 or fewer persons" who allegedly satisfied the 80-percent test and the 50-percent test of section 1563(a)(2)(A) and (B). The Supreme Court held, however, that for purposes of the 80-percent test, each one of the "5 or fewer persons" whose stock ownership is taken into account must own some stock in each corporation in the alleged controlled group. Because Crain owned no stock in Popcorn, his stock in Fertilizer was not permitted to be added to Vogel's, and the 80-percent test was failed with respect to that corporation.

In the present case, by contrast, each of the "5 or fewer persons" whose stock ownership is taken into account in respondent's computation does own stock in each of the corporations in the group. In the case of Bart Chimenti, Bob Chimenti, and Mark Wilson, Jr., the ownership of Complete is not direct, it is, instead, attributed to them through the application of section 1563(e)(4). The statute, section 1563(d)(2), provides, however, that for purposes of "determining whether a corporation is a member of a brother-sister controlled group

of corporations," stock owned by an individual includes both his direct holdings and "stock owned with the application of subsection (e)." Subsection (e) of section 1563, quoted in pertinent part above, contains the attribution rules; under subsection (e)(4), stock owned by a corporation is considered as owned proportionately by any person who owns 5 percent or more of the stock in such corporation and, under subsection (e)(5), an individual is considered as owning stock owned by his spouse. Under these rules, Bart Chimenti, Bob Chimenti, and Mark Wilson, Jr., owned stock in Complete. Reading the *Vogel Fertilizer* case in the light of the literal language of section 1563(d)(2) and the overall statutory scheme, we think it clear that the requirement of ownership of some stock in each corporation by each of the "5 or fewer persons" can be satisfied by constructive ownership under subsection (e) as well as by actual ownership. Accordingly, petitioners' argument in this regard must fail.

Petitioners next argue that respondent "erred in adding corporate attribution to spousal attribution" in the cases of Joseph Chimenti and Mark Wilson, Sr. As set forth in the "80-percent test," above, respondent first determined those two individuals' ownership in Lomas and Sandia by taking into account, not only the shares they owned directly but also the shares owned by their wives. Sec. 1563(e)(5). Joseph Chimenti's and Mark Wilson, Sr.'s ownership of Lomas and Sandia, thus increased, was then used as the basis for attributing to them, pursuant to section 1563(e)(4), a portion of Lomas' and Sandia's stock in Complete. Petitioners argue that this multiple use of the constructive ownership rules was unwarranted. We do not agree. Section 1563(f)(2) provides as follows:

(2) OPERATING RULES.—
    (A) IN GENERAL.—Except as provided in subparagraph (B), stock constructively owned by a person by reason of the application of paragraph (1), (2), (3), (4), (5), or (6) of subsection (e) shall, for purposes of applying such paragraphs, be treated as actually owned by such person.
    (B) MEMBERS OF FAMILY.—Stock constructively owned by an individual by reason of the application of paragraph (5) or (6) of subsection (e) shall not be treated as owned by him for purposes of again applying such paragraphs in order to make another the constructive owner of such stock.

Subparagraph (A) thus establishes the general validity of repeated attribution of stock ownership of the sort here employed by respondent. As an exception to the general rule,

subparagraph (B) prohibits double family attribution under paragraphs (5) (relating to spousal attribution) and (6) (relating to attribution from children, grandchildren, parents, and grandparents) of subsection (e); stock attributed to an individual under those paragraphs is not to be treated as owned by him for purposes of again applying "such paragraphs" to make another person the constructive owner of the stock.

Respondent, however, has not employed double family attribution under paragraphs (5) and (6). Stock in Lomas and Sandia was first attributed to Joseph Chimenti and Mark Wilson, Sr., by spousal attribution under paragraph (5), but the second attribution, i.e., that of a portion of Lomas' and Sandia's stock in Complete, was made pursuant to paragraph (4). Respondent's action, therefore, is within the general operating rule of section 1563(f)(2)(A) permitting repeated attribution of ownership and is not within the scope of the section 1563(f)(2)(B) exception.

Finally, petitioners argue that respondent erred "in misapplying the rules of spousal attribution in order to eliminate the spouse as a 'person' to be counted in the 'five or fewer persons' to which the 80% and the 50% tests are applicable." Petitioners misconstrue the effect of respondent's calculation. Respondent has not "eliminated" Josina Chimenti and Barbara Wilson as "persons." He has merely treated their husbands as owning the shares in the petitioner-corporations actually owned by Josina and Barbara, as he was required to do pursuant to section 1563(e)(5).[4] The ownership of stock by more than one person is dealt with in section 1563(f)(3)(B), which provides that:

(B) If stock is owned (within the meaning of subsection (d)) by two or more persons, such stock shall be considered as owned by the person whose ownership of such stock results in the corporation being a component member of a controlled group. * * *

As this Court has commented:

---

[4] It may be noted that, under sec. 1563(e)(5), the wives are also deemed to own the shares actually owned by their husbands. Respondent, therefore, might just as well have determined petitioners' controlled group status by including Josina and Barbara, rather than their husbands, in the group of "5 or fewer persons" with respect to whose stock holdings the computations were made.

while stock may be owned both actually and constructively by two persons, the ownership of one will not reduce the other's interest but rather will be artificially considered as owned by the person whose stock ownership would create a controlled group. [*Northwestern Steel & Supply Co. v. Commissioner*, 60 T.C. 356, 362 (1973).][5]

All of petitioners' arguments having failed, we hold for respondent on this issue.

### 3. *Inventory Valuation Issue*

Lomas and Sandia were both engaged in the merchandising of small automobile repair parts. Each corporation used the "lower of cost or market" method of inventory valuation. At the end of each of its taxable years now in question, consistent with its practice for several prior years, each corporation wrote down its ending inventory by 3 percent, allegedly to reflect a decline in value due to "damaged, shopworn, or imperfect items." The price at which the inventory was offered for sale was apparently not changed to reflect the write-down. The effect of the write-down of ending inventory was to increase cost of goods sold and, accordingly, to decrease the gross income reported from sales.

Respondent determined that Lomas' and Sandia's write-downs were improper and adjusted their reported income for each of the years in question by eliminating the effect of the write-downs claimed. We agree with respondent and sustain his determination as to this issue.

Section 471 states the general rule for inventories:

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Section 1.471–2(c), Income Tax Regs., provides as follows:

(c) The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. * * * Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, * * * should be valued at bona fide selling prices less

---

[5]See also the example contained in sec. 1.1563–3(b)(4)(ii), Income Tax Regs.

direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used * * * . Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. The burden of proof will rest upon the taxpayer to show that such exceptional goods as are valued upon such selling basis come within the classifications indicated above, and he shall maintain such records of the disposition of the goods as will enable a verification of the inventory to be made.

Section 1.471–4(a), Income Tax Regs., dealing specifically with inventories valued at the lower of cost or market, provides that—

Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer. * * *

As the Supreme Court has noted:

The courts have uniformly interpreted "bid price" to mean replacement cost, that is, the price the taxpayer would have to pay on the open market to purchase or reproduce the inventory items. [*Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 534 (1979). Fn. ref. omitted.]

The regulations further provide, however, that (sec. 1.471–4(b), Income Tax Regs.):

Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. * * *

The effect of the provisions quoted above has been summarized by the Supreme Court as follows:

the regulatory scheme is clear. The taxpayer must value inventory for tax purposes at cost unless the "market" is lower. "Market" is defined as "replacement cost," and the taxpayer is permitted to depart from replacement cost only in specified situations. When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, a taxpayer's assertions as to the "market value" of its inventory are not cognizable in computing its income tax. [*Thor Power Tool Co. v. Commissioner, supra* at 535.]

Lomas' and Sandia's write-downs of inventory below the value determined under the "lower of cost or market" method

were not supported by "objective evidence" of the kind required by the Supreme Court and by the applicable regulations. They were, instead, based on nothing more than petitioners' estimate of the inventory's decline in value. Accordingly, respondent's denial of the write-downs must be sustained. *Thor Power Tool Co. v. Commissioner, supra.*[6]

Petitioners attempt to distinguish the *Thor Power Tool* case on its facts. *Thor Power Tool* dealt with the denial of a write-down of inventory determined by the taxpayer to be in excess of future demand. Petitioners argue that the write-down in that situation is "not to be confused" with the write-down of inventory for damaged, shopworn, and imperfect items taken by Lomas and Sandia in the present case. Both the *Thor Power Tool* opinion (*supra* at 535) and the applicable regulations make it clear, however, that a write-down of inventory below cost or market for any reason must be justified by objective evidence in the form of "actual offerings, actual sales, or actual contract cancellations."[7] The lack of such objective evidence is, therefore, fatal to petitioners' write-downs, just as it was to the ones claimed by Thor Power Tool, even though the reason for the write-down was different.

Petitioners also point out that the write-downs were consistent with their practice in prior years, and argue that they could not have refrained from claiming the write-downs for the years in question because to do so would have constituted a change in accounting method, for which they lacked the prior consent of the Secretary required under section 446(e).[8] Even if

---

[6]See also sec. 1.471–2(f)(1), Income Tax Regs., which prohibits "Deducting from the inventory * * * an estimated depreciation in the value thereof."

[7]See, for example, *Rockwell International Corp. v. Commissioner*, 694 F.2d 60 (3d Cir. 1982), affg. 77 T.C. 780 (1981), in which the court applied *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 534 (1979), to sustain respondent's denial of inventory write-downs which had been taken to reflect the taxpayer's estimated loss on a long-term contract.

[8]Sec. 446(e) provides as follows:

SEC. 446(e). REQUIREMENT RESPECTING CHANGE OF ACCOUNTING METHOD.—Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

It has been held by some courts of appeals that the Secretary's consent is required even when the change which the taxpayer intends to make is from an improper method to a proper one. See, for example, *Witte v. Commissioner*, 513 F.2d 391, 394 (D.C. Cir. 1975), remanding a Memorandum Opinion of this Court. This Court has tended not to require consent in such situations. See *Southern Pacific Transportation Co. v. Commissioner*, 75 T.C.

petitioners are correct in this contention, however, their inability to change from their old, improper method without first securing the Commissioner's consent does not bar the Commissioner from making the change himself, as petitioners appear to imply. The restriction of section 446(e) does not apply to changes initiated by the Commissioner. To the contrary, the "Code and Regulations give the Commissioner broad discretion to set aside the taxpayer's method if, 'in [his] opinion,' it does not reflect income clearly." *Thor Power Tool Co. v. Commissioner, supra* at 540.

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

497, 682 n. 208 (1980).; sec. 1.446–1(e)(2)(iii), examples (7) & (8), Income Tax Regs. Furthermore, sec. 1.446–1(e)(2)-(ii)(*c*), Income Tax Regs., provides that:

"A change in an overall plan or system of identifying or valuing items in inventory is a change in method of accounting. Also a change in the treatment of any material item used in the overall plan for identifying or valuing items in inventory is a change in method of accounting."