HITACHI SALES CORPORATION OF AMERICA, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hitachi Sales Corp. v. Commissioner
Docket No. 21663-90
United States Tax Court
T.C. Memo 1992-504; 1992 Tax Ct. Memo LEXIS 536; 64 T.C.M. (CCH) 634; September 3, 1992, Filed *536 Respondent filed, on March 2, 1992, a motion for partial summary judgment with respect to six issues, all of which are tax accounting issues. In response, petitioner in effect conceded one of those issues, objected to respondent's motion with respect to two of those issues, and filed a cross-motion for partial summary judgment with respect to the remaining three issues. By order dated August 3, 1992, we considered and decided respondent's motion with respect to two issues (including the in-effect-conceded issue). Here, we consider and decide both respondent's motion with respect to the other four issues and petitioner's cross-motion. Further, on May 21, 1992, respondent filed another motion for partial summary judgment, which we also consider and decide here. Petitioner's taxable years at issue are those ended March 31, 1982, 1983, and 1984. 1. Held: Respondent's motion for partial summary judgment filed March 2, 1992, will be granted with respect to petitioner's termination expenses for the former outside sales representatives, professional fees related in part to the termination of such representatives, and California franchise taxes. 2. Held, further, respondent's *537 motion for partial summary judgment filed March 2, 1992, will be granted with respect to petitioner's valuation of its ending inventory of spare parts. 3. Held, further, petitioner's cross-motion for partial summary judgment will be denied with respect to the professional fees, the California franchise taxes, and the valuation of the ending inventory of spare parts. 4. Held, further, respondent's motion for partial summary judgment filed May 21, 1992, will be denied. For Petitioner: Nancy L. Iredale and Robert A. Earnest. For Respondent: Anne Hintermeister, Frances Ferrito Regan, and Steven R. Winningham. HALPERN
HALPERN
MEMORANDUM OPINION HALPERN, Judge: This matter is before the Court on respondent's motion for partial summary judgment filed March 2, 1992. In that motion, respondent asks for partial summary judgment on six issues. All of these issues are tax accounting issues. By order dated August 3, 1992, we have considered and decided respondent's motion with respect to two issues. Regarding the other four issues, petitioner objects to respondent's motion with respect to one issue and has filed a cross-motion for summary judgment with respect to the remaining *538 three issues. Those four issues, which we consider here, are: (1) Whether, for its taxable year ended March 31, 1984, petitioner may deduct an addition to an accounting reserve for petitioner's estimated liability to certain outside sales representatives, whose relationship with petitioner had been terminated; (2) whether, for such 1984 taxable year, petitioner may deduct an estimate of its liability for fees and costs related to future legal advice; (3) whether, for its taxable years ended March 31, 1982, 1983, and 1984, section 461(d) governs petitioner's deduction of certain California franchise taxes; and (4) whether, for such taxable years, petitioner may make certain adjustments to its ending inventory of spare parts. Respondent has also made an additional motion for partial summary judgment (styled as a cross-motion), filed May 21, 1992, with regard to petitioner's inventory method. We also deal with that motion. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. Introduction
Petitioner, a California corporation, *539 is a wholly owned subsidiary of Hitachi Sales Corp., a Japanese corporation (HSCJ). A majority shareholder of HSCJ is Hitachi, Ltd., another Japanese corporation. At the time the petition in this case was filed, petitioner's principal place of business was in Compton, California. During the years at issue, petitioner was in the business of selling Hitachi brand consumer electronics equipment in the United States. Such equipment was manufactured by Hitachi, Ltd., or its subsidiaries, and was purchased by petitioner from HSCJ. Petitioner used the accrual method of accounting in that line of business, and all questions here addressed involve that line of business. A summary judgment is appropriate "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that a decision may be rendered as a matter of law." Rule 121(b). Summary judgment, however, is not a substitute for a trial, in that disputes over factual issues are not to be resolved in such proceedings. Espinoza v. Commissioner, 78 T.C. 412, 416 (1982); *540 Shiosaki v. Commissioner, 61 T.C. 861, 862 (1974). The party moving for summary judgment has the burden of showing the absence of a genuine issue as to any material fact. Espinoza v. Commissioner, supra; Shiosaki v. Commissioner, supra.Nevertheless, the opposing party cannot rest upon the allegations or denials in his pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); Morrison v. Commissioner, 81 T.C. 644, 650-651 (1983). The parties have filed a joint stipulation of facts and attached stipulated documents as well as various affidavits and memoranda of law. We accept the stipulated facts as being true for purposes of deciding these motions for summary judgment. The stipulation of facts and attached documents are incorporated by this reference. We will consider separately each of the four issues before us on summary judgment. Issue 1. Sales Representatives Termination Expenses
This issue concerns petitioner's taxable year ended March 31, 1984. For that year, petitioner claimed a deduction in the amount of $ 879,221, representing *541 petitioner's addition to an accounting reserve for its estimate of its liability on account of the termination of its relationship with certain outside sales representatives. Respondent denied petitioner's deduction on the ground that, with regard to it, petitioner had not satisfied the prerequisites of the accrual method of accounting. Petitioner objects to respondent's motion, but has not filed a cross-motion for partial summary judgment. In addition to the joint stipulation of facts and attached stipulated documents, respondent has filed, in support of her motion on this issue, an affidavit of revenue agent Linda Escalona. In opposition to respondent's motion on this issue, petitioner has filed affidavits of Matthew Clark, a lawyer employed by petitioner, and Ronald Wilcox, a partner in the accounting firm that prepared petitioner's financial statements and tax returns. The joint stipulation of facts and stipulated documents establish the following. 1. In September 1983, petitioner decided to replace its existing sales force of outside sales representatives with an internal sales organization devoted exclusively to marketing Hitachi products. By letters dated September *542 1983, petitioner formally notified its 32 outside sales representatives that, effective as of January 1, 1984, petitioner was assuming full responsibility, through its own sales force, for all sales activities with its dealers and distributors of consumer electronic products in the United States and, therefore, was terminating their relationship with petitioner. In that letter, petitioner stated that it had tried to accommodate the representatives to the extent possible and was giving the representatives substantially more than the 30-day notice of termination required under their agreement. Petitioner stated further that it felt that the manner in which the relationship was being terminated was very reasonable and offered to make a severance payment based on the number of years of service to those terminated representatives who executed a release agreement. 2. In January 1984, petitioner submitted for signature a release agreement to each terminated representative. In a letter dated January 1984, petitioner referred to the "bonus" funds specified in its earlier letter of termination and stated that, unless it received an executed release agreement by February 15, 1984, its offer *543 of a severance payment would be withdrawn and no other financial arrangement would be entertained. Under the release agreement, the terminated representative would release petitioner from any and all claims against petitioner, including without limitation any and all claims arising out of any prior sales representative relationship between the terminated representative and petitioner. The release agreement further provided that it did not constitute an admission of liability on the part of either party. 3. Earlier, in September 1983, petitioner had established a reserve account for the total amount of severance payments offered to the 32 terminated representatives. Petitioner initially added $ 1,083,879 to that account. During February 1984, 17 of the terminated representatives received severance payments totaling $ 204,659. The balance of the reserve account, or $ 879,221, was accrued as a liability on petitioner's 1984 financial statements. For the 1984 taxable year, petitioner deducted the full addition to the reserve account, $ 1,083,879, on its tax return. Respondent disallowed that portion of the deduction, $ 879,221, allocable to amounts not yet paid. 4. Ten of the *544 terminated representatives, who did not sign releases, filed a lawsuit against petitioner in California State court. The causes of action against petitioner related to reformation of certain commission agreements, intentional tortious interference with prospective business relationships and economic advantages, contractual breach of the implied covenant of good faith and fair dealing, and fraudulent concealment of material facts. The representatives sought total damages of between $ 50 and $ 100 million in excess of the amount accrued by petitioner. In its answer, petitioner denied all liability to the 10 plaintiffs. 5. In late March 1985, plaintiffs' counsel and petitioner discussed specific settlement offers. The plaintiffs offered to settle for an amount equal to three times the commissions earned during their last year as sales representatives, and petitioner responded that it would settle for substantially the same amounts petitioner offered in September 1983. In October 1985, the 10 plaintiffs and 3 other terminated sales representatives, who were involved in arbitration proceedings with petitioner, reached a settlement with petitioner for a total of roughly $ 4 million, *545 and petitioner paid that amount at that time. Pursuant to the settlement, the 13 terminated representatives released and forever discharged petitioner, and petitioner released and forever discharged the 13 representatives, from all claims and liabilities, including all claims and liabilities related to the termination litigation and the arbitration proceedings. Under the settlement, petitioner and the 13 terminated representatives agreed that, by entering into the settlement, neither party admitted the existence of any fault or liability or the validity of any claim or defense whatsoever. The affidavit of Linda Escalona submitted by respondent fails to add any information not otherwise found in the joint stipulation of facts and the stipulated documents. The affidavit of Matthew Clark submitted by petitioner, however, contains the following statements: 5. Based on a substantial in-house analysis of Petitioner's relationship with and past commitments to its sales representatives, Petitioner made an assessment that the amount of the Severance Payments would be the minimum amount of Petitioner's obligation to the terminated sales representatives, * * *. 6. The amount of Severance *546 Payments * * * was further based on advice from Petitioner's outside counsel, Kindel & Anderson, that it was consistent with the amount of legal liability which Petitioner would face in the event of litigation for the termination of the sales representatives. * * * 8. * * * Although Petitioner said the offer [of severance payments] was to be withdrawn unless the documents were returned by February 15, 1984, the purpose of this statement was to encourage the terminated sales representatives to settle with Petitioner rather than litigating their claims. Notwithstanding the standard "puffery" of these letters, Petitioner remained willing to settle all of the claims of the terminated sales representitives at all times for the amount set forth in the * * * [letter of September 1983]. Further, the affidavit of Ronald Wilcox submitted by petitioner contains the following statements: 8. On June 1, 1984, a lawsuit was filed against Petitioner on behalf of certain former sales representatives alleging total damages substantially in excess of the amount accrued by Petitioner. 9. Opinions of counsel were obtained from two law firms, Kindel & Anderson and Munger, Tolles & Olsen, which *547 concluded that the lawsuit could only be settled for an amount substantially in excess of the amount accrued by Petitioner. In its notice of objection to respondent's motion, petitioner argues that summary judgment in respondent's favor is barred by the following disputed issues of material fact: (1) Whether petitioner incurred a liability upon terminating the representatives; (2) whether petitioner admitted liability to the representatives; and (3) whether petitioner contested its liability for the amount accrued. Apparently, there is no disagreement between the parties that petitioner is entitled to deduct amounts paid or incurred on account of severance payments made to petitioner's former outside sales representatives. See sec. 162(a). The quarrel concerns only timing, i.e., when petitioner may take such a deduction for tax purposes under the accrual method of accounting. Section 461(a) provides that a taxpayer may deduct any amount allowed by the Internal Revenue Code for the taxable year that is the proper taxable year under the accounting method used by the taxpayer in computing taxable income. Under the accrual method of accounting, an expense is deductible for the *548 taxable year in which all the events have occurred which determine the fact of the liability and the amount of the liability can be determined with reasonable accuracy (the all events test). See sec. 1.461-1(a)(2), Income Tax Regs. The all events test has two prongs: (1) All events that bear on the fact of liability must have occurred, and (2) the amount of liability must be determinable with reasonable accuracy. United States v. Anderson, 269 U.S. 422 (1926); Burnham Corp. v. Commissioner, 90 T.C. 953, 955 (1988), affd. 878 F.2d 86 (2d Cir. 1989). The first prong of that two-part test ensures that a taxpayer will not take deductions for expenditures that might never occur. Burnham Corp. v. Commissioner, supra at 955; World Airways, Inc. v. Commissioner, 62 T.C. 786, 802 (1974), affd. 564 F.2d 886 (9th Cir. 1977). The liability must be firmly established and may not be contingent. United States v. General Dynamics Corp., 481 U.S. 239, 244 (1987). With respect to the second prong, the fact that the exact amount of the liability cannot be determined *549 will not prevent the accrual within the taxable year of such part of the liability as can be computed with reasonable accuracy. See sec. 1.461-1(a)(2), Income Tax Regs. Of course, failure to satisfy either prong is fatal to the taxpayer's deduction or credit. Burnham Corp. v. Commissioner, supra at 955. At the suggestion of respondent, we have accepted as true the allegations in the affidavits submitted by petitioner with respect to the termination expenses. Nevertheless, petitioner has not set forth any specific facts showing that there is a genuine issue for trial, even as to the three factual issues cited by petitioner as requiring a trial. Rule 121(d). We will grant respondent's motion on this issue, as the first prong of the all events test has not been met. Petitioner argues that it incurred a liability when it terminated its relationship with its sales representatives. It is, however, fundamental to the all events test that, although expenses may be deductible before they have become due and payable, liability must first be firmly established. United States v. General Dynamics Corp., supra at 243. Thus, an accrual method *550 taxpayer may not deduct a liability that is contingent or contested. Id. Neither may he deduct an estimate of an anticipated expense, no matter how statistically certain, if the estimate is based on events that have not occurred by the close of the taxable year. Id. While sound business accounting practice may require a taxpayer to set up a reserve for a contingent liability, the liability itself may be too uncertain to permit a deduction for tax purposes. See Lucas v. American Code Co., 280 U.S. 445, 452 (1930); General Communication Co. v. Commissioner, 33 T.C. 640, 655-656 (1960). The exact nature of the liability here reserved against by petitioner is unclear, although it appears that a portion of that liability was of a contractual nature, while the remainder was of a tortious nature. In Lucas v. American Code Co., supra at 450 (a case dealing with a breach of contract), it was stated that an accrued liability is not to be regarded as fixed unless there is "a definite admission of liability, negotiations for settlement are begun, and a reasonable estimate of the amount of the loss is accrued on the books." *551 (Fn. ref. omitted.) A contested liability is not accruable until the contest ends. Dixie Pine Products Co. v. Commissioner, 320 U.S. 516 (1944). By the end of the taxable year here in question (March 31, 1984), petitioner's offer of a severance payment had been withdrawn. No further offer was made during the taxable year 1984. Indeed, in June 1984 (in the next taxable year), in answer to a lawsuit brought by 10 of the terminated representatives, petitioner denied all liability. On the evidence at hand, we cannot conclude that, by the end of taxable year 1984, petitioner's liability had become fixed within the meaning of Lucas v. American Code Co., supra.Likewise, we are unable to conclude that it was uncontested. See Dixie Pine Products v. Commissioner, supra.Petitioner cannot rest on mere assertions to the contrary. Petitioner must set forth specific facts showing that there is a genuine issue for trial. Rule 121(d). That, petitioner has failed to do. Thus, as stated, we will grant respondent's motion for partial summary judgment on this issue. Issue 2. Professional Fees
This issue also concerns *552 petitioner's taxable year ended March 31, 1984. It concerns petitioner's deduction of legal fees and costs relating to the termination of the outside sales representatives discussed in the first issue. Pursuant to its interpretation of the accrual method of accounting, petitioner accrued not only professional fees incurred during the 1984 taxable year, but also an estimate of professional fees to be incurred in the future. Respondent disallowed a deduction for the estimated portion, or $ 540,000, on the grounds that the requirements of the accrual method had not been satisfied. Each party has moved for partial summary judgment on this issue. Regarding this issue, besides the joint stipulation of facts and attached stipulated documents, respondent has filed an affidavit of revenue agent Linda Escalona in support of her motion, and petitioner has filed affidavits of Robert Takeuchi, a partner in the law firm of Kindel & Anderson, and Ronald Wilcox, a partner in the accounting firm that prepared petitioner's financial statements and tax returns, in support of its motion. The joint stipulation of facts and accompanying stipulated documents establish that petitioner retained *553 the law firm of Kindel & Anderson in connection with the termination litigation and that, on April 20, 1984, Kindel & Anderson delivered to petitioner a letter that contained an estimate of future legal fees and costs. That letter, whose author is Kindel & Anderson partner Robert Takeuchi, contains the following: As you know, my letter to Peat, Marwick, Mitchell & Co. ("PMM"), dated April 19, 1984, which letter was delivered yesterday to PMM, and a copy of which letter is enclosed for your reference, describes various litigation matters with which we are involved as counsel for HSCA. As discussed, with respect to these litigation matters which we are handling for HSCA, I estimate that our legal fees to be incurred and costs and expenses to be advanced during the next three years should be a minimum of $ 540,000 (based upon an average over those three years of $ 15,000 per month). As you know, it is difficult to make these estimates since our time and expenses incurred could well exceed the estimated amounts set forth above, particularly if (as is often the case) unforeseen problems or disputes arise in the course of any such litigation. On the other hand, if any of *554 these litigation matters are settled or otherwise resolved more quickly or expeditiously than expected, our fees and expenses could be less than that estimated above. The foregoing estimates as to our future legal fees and expenses are limited to the litigation matters which are presently pending and do not include our services required with respect to new litigation matters, or to any non-litigation matters with respect to which we continue to provide legal services. [Emphasis added.] The Escalona affidavit submitted by respondent fails to add any information not otherwise found in the joint stipulation of facts and stipulated documents. However, the affidavit of Robert Takeuchi submitted by petitioner states in part: 3. During the calendar years 1983 and 1984, * * * Kindel & Anderson served as counsel for Hitachi Sales Corporation of America ("Petitioner") with respect to several matters. 4. During the taxable year ended March 31, 1984, Petitioner retained the law firm of Kindel & Anderson to advise Petitioner in connection with the termination of certain of its sales representatives. 5. By March 31, 1984, Kindel & Anderson had rendered considerable advice to Petitioner *555 concerning the termination of its sales representatives. 6. I am experienced in estimating legal fees. When petitioner requested an estimate for legal fees as to certain litigation matters, I prepared one and had it delivered on April 20, 1984 * * *. 7. From July 1984 through December 1988, Kindel & Anderson billed Petitioner approximately $ 1.3 million for legal fees and costs advanced for the Star Sales, or sales representative termination, litigation. In addition, the affidavit of Ronald Wilcox submitted by petitioner contains in part the following: 4. By the end of Petitioner's 1984 taxable year, Petitioner had become involved in a legal dispute with certain terminated sales representatives over the amount of their severance payments. As a consequence of this legal dispute which expanded into protracted litigation, Petitioner retained before the close of the 1984 taxable year the law firm of Kindel & Anderson to provide litigation services. 5. Petitioner received from Kindel & Anderson a letter setting forth a reasonable estimate of its fees for litigation services, which related primarily to the litigation involving the terminated sales representatives. * * * The *556 parties agree that there are no genuine issues of material facts with regard to this issue. In connection with the first issue, we discussed section 461 and the accrual method of accounting. We described the all events test and its two prongs. See sec. 1.461-1(a)(2), Income Tax Regs. Here, petitioner again has failed the first prong of the all events test (i.e., all events that bear on the fact of liability must have occurred). At the end of the 1984 taxable year, petitioner had no liability to Kindel & Anderson with regard to the disputed amount. Kindel & Anderson provided only an estimate of what the fees and expenses for future legal work might be if litigation ensued. Indeed, had all of petitioner's terminated sales representatives accepted petitioner's offer of severance pay, there would have been no litigation costs at all. Accrual for tax purposes cannot rest on the mere possibility that an amount will be paid. Until petitioner incurred a liability to Kindel & Anderson (or some other firm), no accrual was allowable. See, e.g., World Airways, Inc. v. Commissioner, 62 T.C. 786 (1974), affd. 564 F.2d 886 (9th Cir. 1977). Accordingly, *557 respondent's motion for partial summary judgment on this issue will be granted, while petitioner's cross-motion will be denied. Issue 3. California Franchise Taxes
This issue concerns petitioner's taxable years ended March 31, 1982, 1983, and 1984. For those years, the parties have stipulated that petitioner deducted California franchise taxes in the amounts of $ 295,962, $ 297,445, and $ 1,053,695 respectively. In her notice of deficiency, respondent disallowed in part petitioner's deductions for such franchise taxes on the ground that an accrual of the disallowed portions was not permitted by section 461 and the regulations thereunder. The parties have stipulated that respondent's adjustments are as follows: [1]
Taxable Years
Ended
March 31, 1982
March 31, 1983
March 31, 1984
Deducted
$ 295,962
$ 298,695
$ 1,053,695
Allowed
63,252
295,962
297,445
Adjustment
232,710
2,733
756,250
*558 Each party has moved for partial summary judgment on this issue. Regarding this issue, besides the joint stipulation of facts, respondent has filed an affidavit of revenue agent Linda Escalona, and petitioner has filed an affidavit of Ronald Wilcox, a partner in the accounting firm that prepared petitioner's financial statements and tax returns. The joint stipulation of facts and attached stipulated documents establish the following. 1. The California Bank and Corporation Franchise Tax is an annual tax imposed on certain types of corporations for the privilege of exercising the corporate franchise in the State of California. Prior to 1972, the amount of the franchise tax due on the first day of a particular year (the privilege year) was computed by reference to the taxpayer's income during the preceding year (the income year). In 1972, California law was changed such that the franchise tax was computed by reference to the taxpayer's income during the income year and was due on the last day of the income year, rather than on the first day of the privilege year. 2. For the taxable years ended March 31, 1982, 1983, and 1984, petitioner reported, on its California Franchise Tax *559 Returns (Forms 100), total California franchise taxes in the amounts of $ 295,962, $ 297,445, and $ 1,053,695, respectively. During the taxable years at issue, petitioner consistently accrued and deducted California franchise taxes in the income year, rather than in the succeeding or privilege year. 3. A bulletin dated September 30, 1977, from petitioner's accounting firm states in relevant part: You will recall that the California Franchise tax law was changed effective January 1, 1972 to provide that liability for the franchise tax accrues as of the end of the income year instead of the beginning of the privilege year. It was thought that this change would result in permitting accrual basis taxpayers to deduct for Federal income tax purposes the franchise tax during the income year by which the tax is measured. The Internal Revenue Service has consistently denied deductions on this basis. The California Society of CPA's has attempted for several years to get the IRS to rule favorably on a current deduction, at least with respect to corporations commencing business after 1971. I have learned that a GCM does not distinguish between post-71 and pre-72 corporations. The technical *560 coordinator in the San Francisco district has agreed to instruct agents to allow the deduction on a current basis. The technical coordinator of the Los Angeles district has been instructed to do the same thing. While the Escalona affidavit submitted by respondent contains no additional information, the affidavit of Ronald Wilcox submitted by petitioner contains the following statements: 5. Since petitioner began operations, petitioner has consistently accrued and deducted its California franchise taxes on the last day of the income measurement year. 6. The Internal Revenue Service has been inconsistent in its position as to when the California franchise tax is deductible. The IRS first applied the accrual method of accounting to California franchise taxes in Revenue Ruling 68-305, 1968-1 C.B. 213. Even after the California law changed in 1972, the Chief of the Examination Divisions of both Los Angeles and San Francisco approved in 1977 the accrual of the franchise tax in the income measurement year [rather than in the succeeding or privilege year]. Further, this position was espoused by the Los Angeles District Director. However, the IRS later *561 announced in Revenue Ruling 79410, 1979-2 C.B. 213, that the accrual method could not be used for California franchise taxes, even though the tax is due on the last day of the income measurement year and is calculated based on income earned entirely within the income measurement year. In essence, the parties agree that, for the taxable years before us, petitioner has deducted its California franchise taxes in accordance with the all events test found in section 461(a) and the corresponding regulations -- namely, on the last day of the income year. The parties, however, disagree on whether section 461(d) prevents accrual of such taxes until the following year. The dispute here, thus, centers on the applicability of section 461(d). To understand the crux of the dispute, it is necessary first to understand something of the California franchise tax and our cases with regard to it. California imposes an annual franchise tax on certain corporations doing business in the State of California for the privilege of exercising their corporate franchises. Cal. Rev. & Tax Code sec. 23151 (West 1992). Prior to 1972, the California franchise tax accrued on the day *562 following the last day of the income year. In Central Investment Corp. v. Commissioner, 9 T.C. 128, 132-133 (1947), affd. per curiam 167 F.2d 1000 (9th Cir. 1948), we held that corporate taxpayers using the accrual method could accrue the California franchise tax for the privilege year based upon the preceding year's net income only in the privilege year, because the franchise was essentially a tax on the privilege of doing business in the privilege year. In 1972, California changed its law such that the franchise tax accrued on the last day of the income year, rather than on the first day of the privilege year. In Epoch Food Service, Inc. v. Commissioner, 72 T.C. 1051, 1054 (1979), we found that the effect of the 1972 California franchise tax amendment was to change the accrual date for the privilege year's tax based upon the preceding or income year's net income from January 1 of the privilege year to December 31 of the income year (in the case of a calendar-year taxpayer). After the 1972 amendment, the event fixing the liability for the California franchise tax is the earning of net income in the income year, rather than *563 the exercising of the corporate franchise in the privilege year. Id. at 1053-1054. Section 461(d) overrides the normal rules for accruing taxes in certain events. Section 461(d)(1) provides that: In the case of a taxpayer whose taxable income is computed under an accrual method of accounting, to the extent that the time for accruing taxes is earlier than it would be but for any action of any taxing jurisdiction taken after December 31, 1960, then, under regulations prescribed by the Secretary, such taxes shall be treated as accruing at the time they would have accrued but for such action by such taxing jurisdiction. Under the regulations, any action of a taxing jurisdiction which, but for section 461(d) and the accompanying regulations, would accelerate the time for accruing a tax is to be disregarded in determining the time for accruing such tax for purposes of the deduction allowed for such tax. Sec. 1.461-1(d)(1), Income Tax Regs. The taxpayer must continue to use the original accrual date for all future taxable years. Id.
Respondent argues that section 461(d) governs and that petitioner may not accrue any deduction for California franchise taxes *564 in advance of the privilege year. Petitioner responds with several arguments. First, petitioner admits that, prior to the 1972 amendment, it improperly accrued and deducted its California franchise taxes in the income year. After the 1972 amendment, of course, petitioner's practice of accruing and deducting its franchise taxes in the income year comported with the all events test. Petitioner suggests that, since it improperly accelerated deductions for franchise taxes prior to the 1972 amendment, the 1972 amendment did not accelerate the time petitioner accrued such taxes. In that view, section 461(d) would be inapplicable, as the "but for" language in that section would not apply. We reject that argument, as we find no support for it in the language of either the statute, the regulations, or the legislative history. See sec. 461(d); sec. 1.461-1(d), Income Tax Regs.; Conf. Rept. 2213, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 902, 905. Absent any explicit language or statement to the contrary in the statute, regulations, or legislative history, we must conclude that "the time for accruing taxes" in section 461(d) refers to the correct time for accrual prior *565 to the action of the taxing jurisdiction. We find no express or implied exception for taxpayers who, prior to the action of the taxing jurisdiction, improperly accelerated their deductions. Second, petitioner argues that section 461(d) is limited to cases where, as a result of an action of a taxing jurisdiction, a taxpayer tries to deduct more than 1-year's worth of State taxes in one Federal taxable year. We reject that argument, as we find nothing that limits section 461(d) to such "double-dip" years. See generally Globe Newspaper Co. v. United States, 223 Ct. Cl. 406, 620 F.2d 841, 849-851 (1980). There is no language in section 461(d) that so limits the applicability of that section. Absent compelling reason to do otherwise, we must assume that Congress knew how to draft a statute limited solely to "double-dip" years and that the fact that the statute was not so drafted was intentional on the part of Congress. See id. While Congress was undeniably concerned about preventing a taxpayer from deducting more than 1-year's worth of a State or local tax in 1 Federal taxable year, the legislative history does not suggest that section 461(d) *566 applies only to "double-dip" situations. Conf. Rept. 2213, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 902, 905; Globe Newspaper Co. v. United States, supra at 851. In contrast, there is express language in the regulations that provides that section 461(d) is not limited to "double-dip" situations. Sec. 1.461-1(d)(1), Income Tax Regs., the validity of which neither party challenges, provides as follows: Such action [of a taxing jurisdiction taken after 1960] is to be disregarded not only with respect to a taxpayer ( * * * ) upon whom the tax is imposed at the time of the action, but also with respect to such a taxpayer upon whom the tax is imposed at any time subsequent to such action. * * * Whenever the time for accruing taxes is to be disregarded in accordance with the provisions of this paragraph, the taxpayer shall accrue the tax at the time (original accrual date) the tax would have accrued but for such action, and shall, in the absence of any action of the taxing jurisdiction placing the time for accruing such tax at a time subsequent to the original accrual date, continue to accrue the tax as of the original accrual date for all future *567 taxable years. [Emphasis added.] Third, petitioner makes several "equitable" arguments. It cites Atlantic City Electric Co. v. Commissioner, T.C. Memo. 1958-25, for the proposition that a consistent, though incorrect, pattern over 2 decades of accruing taxes takes precedence over the all events test. All we need to say about Atlantic City Electric Co. is that it preceded the enactment of section 461(d) and, thus, could not represent any exception to section 461(d), which mandates a different result. Further, petitioner's citations to various supposed actions and statements by respondent's local representatives in California are irrelevant. Those actions and statements occurred prior to the years before us and prior to the issuance of Rev. Rul. 79-410, 1979-2 C.B. 213, which placed petitioner on notice as to respondent's position. In that ruling, respondent applied section 461(d) to the 1972 California franchise tax amendment and held, pursuant to that section, that both corporations subject to the franchise tax prior to 1972 and corporations commencing the conduct of business in California after 1972 were required to accrue *568 the California franchise tax in the privilege year, rather than in the income year. We conclude that, for the years at issue, section 461(d) and the corresponding regulations require petitioner to deduct California franchise taxes in the year following the income year. We, thus, will grant respondent's motion for summary judgment on the franchise tax issue and will deny petitioner's cross-motion on that issue. Issue 4. Spare Parts Inventory
Petitioner keeps an inventory of spare parts. For its taxable years ended March 31, 1982, 1983, and 1984, petitioner "marked down" its ending inventory of spare parts. In her notice of deficiency, respondent disallowed petitioner's inventory markdowns on the grounds that the valuations used for such markdowns were unsubstantiated. Respondent's adjustments are as follows: Taxable Years Ended
March 31, 1982
March 31, 1983
March 31, 1984
Correct ending
$ 1,264,519
$ 1,379,689
$ 1,423,772
inventory
Ending inventory
420,000
420,000
420,000
per return
Adjustment to
844,519
959,689
1,003,772
ending inventory
Less prior year's
0   844,519
959,689
adjustment
Disallowance
$   844,519
$   115,170
$    44,083
*569 Respondent has filed a motion for partial summary judgment that petitioner is not entitled to such markdowns for its spare parts inventory. In turn, petitioner has filed a cross-motion for partial summary judgment that it is so entitled. With regard to that issue, in addition to the joint stipulation of facts, respondent has filed an affidavit of revenue agent Linda Escalona, and petitioner has filed affidavits from Rod Ruff, an employee of petitioner, and Ronald Wilcox, a partner in the accounting firm that prepared petitioner's financial statements and tax returns. The joint stipulation of facts and attached stipulated documents establish the following. 1. Petitioner maintains an inventory of spare parts for a designated number of years for merchandise that it sells. 2. During the taxable years at issue, in valuing inventory for purposes of its tax returns, petitioner valued closing inventory at the lower of cost or market. 3. In such years, in determining cost for inventory purposes, cost was set at 125 percent of the invoice cost for each spare part in inventory. 4. In such years, petitioner determined that approximately 50,000 slow-moving or nonmoving items should *570 be written down to 10 percent of cost. 5. In each of such years, petitioner reported ending inventory for spare parts as $ 420,000. 6. In such years, petitioner did not sell spare parts at any prices other than its normal or usual prices. 7. In such years, petitioner never sold or offered to sell spare parts for less than 125 percent of the invoice cost. 8. Although petitioner wrote down its inventory at the end of each of the taxable years in issue, it did not scrap the spare parts or sell them at reduced prices at the time of the writedowns. The affidavit of Linda Escalona submitted by respondent in support of her motion for partial summary judgment contains no information not otherwise found in the joint stipulation of facts. The affidavit of Ronald Wilcox contains the following statements: 3. For financial accounting and tax accounting purposes, Petitioner initially carries its spare parts inventory on its books at 25 percent over its actual cost in order to reflect the costs Petitioner would incur to transport, insure and handle these spare parts. Consequently, the dollar amount assigned to Petitioner's spare parts inventory must be reduced by 20 percent to arrive *571 at the actual "cost" of the inventory. 4. Based on a 1981 study, Petitioner determined that its regular moving inventory of spare parts, i.e., the top 1000 selling spare parts, should not be written down. However, the remaining inventory consisted of approximately 50,000 items that were either slow moving with no active market (usually less than three items per year) or non-moving (no sales within three months). To accurately reflect the market value of these slow moving and non-moving spare parts, it was necessary to write down the slow moving and non-moving inventory by 90 percent. 5. Based on a review of Petitioner's non-moving inventory for the quarter of the 1984 taxable year, there was approximately 748,314 non-moving spare parts in stock with an original carrying cost of $ 630,284.47. Furthermore, the affidavit of Rod Ruff contains the following statements: 5. State consumer protection laws effectively prohibited Petitioner from destroying the inactive and slow moving inventory by requiring Petitioner both to provide spare parts within 30 days and to retain an inventory of spare parts for periods up to 7 years after the date of the last sale of the related product. *572 The lead time necessary to obtain imported spare parts was six to twelve months. * * * [Absent these] consumer protection laws, Petitioner would have sold its inactive or slow moving spare parts inventory for scrap value. * * * 7. The application of Indiana's consumer protection law to Petitioner was confirmed in a letter [dated March 30, 1992,] from James C. Spencer, Deputy Attorney General, of the Consumer Protection Division of the Office of the Indiana Attorney General. * * * 8. During the years at issue, goods sold by Petitioner were expressly warranted by Petitioner. The general rule with regard to the use of inventories is set forth in section 471. Section 471 provides two tests to which each system of inventory must conform: (1) It must conform as nearly as may be to the best accounting practice in the trade or business, and (2) it must clearly reflect income. Sec. 471; sec. 1.471-2(a), Income Tax Regs. The first test imposes a standard that is synonymous with "generally accepted accounting principles." Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532 (1979). As for the second test, respondent has wide discretion in determining whether *573 a particular method of inventory accounting should be disallowed as not clearly reflective of income, and respondent's disallowance of an inventory accounting method is not to be set aside unless shown to be plainly arbitrary. Thor Power Tool Co. v. Commissioner, supra at 532-533. The "lower of cost or market" method of inventory accounting used by petitioner during the years in question is provided for in the regulations. See sec. 1.471-2(c), Income Tax Regs. In the case of merchandise on hand at the beginning of the taxable year, "cost" means the inventory price of such goods. Sec. 1.471-3(a), Income Tax Regs. In the case of merchandise purchased since the beginning of the taxable year, cost means the invoice price less certain trade or other discounts and includes transportation or other necessary charges incurred in acquiring possession of the goods. Sec. 1.471-3(b), Income Tax Regs. Under ordinary circumstances and for normal goods in inventory, "market" means (for goods purchased and on hand) the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer. Sec. *574 1.471-4(a), Income Tax Regs. "Bid price" has been interpreted to mean replacement cost, or the price the taxpayer would have to pay on the open market to purchase or reproduce the inventory items. Thor Power Tool Co. v. Commissioner, supra at 534. Where no open market exists or where quotations are nominal, due to inactive market conditions, a special rule applies. Thus, section 1.471-4(b), Income Tax Regs., which the parties agree governs this case, provides: (b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the *575 actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market. [2]
The Supreme Court has summarized the regulatory scheme concerning the "lower of cost or market" method, as follows: The taxpayer must value inventory for tax purposes at cost unless the "market" is lower. "Market" is defined as "replacement cost," and the taxpayer is permitted to depart from replacement cost only in specified situations. When it makes any such departure, the taxpayer must substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations. In the absence of objective evidence of this kind, a taxpayer's assertions as to the "market value" of its inventory are not cognizable in computing *576 its income tax. [Thor Power Tool Co. v. Commissioner, supra at 535.] The dispute here is not over the cost of petitioner's spare parts inventory, but over whether petitioner properly has determined a lower market value for such inventory. We will grant respondent's motion for partial summary judgment on this issue and deny petitioner's cross-motion, because we conclude that the law is clear and petitioner has not established that there are factual issues deserving of trial. Section 1.471-4(b), Income Tax Regs. requires some objective evidence of a fair market value, such as specific purchases or sales by the taxpayer or others. See Thor Power Tool Co. v. Commissioner, supra at 535. Although petitioner wrote down its slow-moving and nonmoving inventory to 10 percent of cost, petitioner fails to explain why 10 percent was chosen, as opposed to some other percentage. Cf. Import Specialties, Inc. v. Commissioner, T.C. Memo. 1982-41; Floyd v. Commissioner, 11 B.T.A. 903 (1928); Bloom Brothers, Inc. v. Commissioner, 10 B.T.A. 710 (1928); True v. Commissioner, 6 B.T.A. 1042 (1927). *577 Moreover, there is no explanation of why different percentages were not used for different types of spare parts or why the same percentage was used for slow-moving versus nonmoving inventory. Cf. Sam Goldberger, Inc. v. Commissioner, 88 T.C. 1532, 1551-1554 (1987). Petitioner has submitted two affidavits that refer to an 1981 study that supposedly distinguished between regular-moving, slow-moving, and possibly nonmoving inventory of spare parts. The record, though, contains no information on that study from which we can conclude that petitioner's valuation of its spare parts inventory was based on objective evidence. Petitioner has not asserted any facts about that study sufficient to show market price as required by section 1.471-4(b), Income Tax Regs. Petitioner has not met the burden imposed on it by Rule 121(d) to set forth specific facts in opposition to respondent's motion that show a genuine issue for trial that market value is any less than cost, as those terms are used in the regulation. Petitioner does argue, however, that section 1.471-4(b), Income Tax Regs., distinguishes between slow-moving and nonmoving inventory and that Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979), *578 should be distinguished, because it deals with slow-moving, rather than nonmoving, inventory. We, however, interpret Thor Power Tool Co v. Commissioner, supra, to require at the minimum some objective evidence of the market value or market conditions, regardless of what type of inventory is at issue. Cf. Complete Finance Corp. v. Commissioner, 80 T.C. 1062, 1071-1072 (1983), affd. 766 F.2d 436 (10th Cir. 1985); Primo Pants Co. v. Commissioner, 78 T.C. 705, 718-719 (1982). We must, thus, reject petitioner's argument since, as stated, petitioner has not presented a genuine issue for trial as to market value being lower than cost. We note that petitioner has stipulated not only that it did not sell any spare parts at the prices that petitioner considered market prices (i.e., the written -down prices), but that it failed even to offer to sell such parts at such prices. Finally, petitioner argues that certain State consumer protection laws prevented petitioner from disposing of the spare parts at issue and that, as such, petitioner should not be required to dispose of such parts in order to be able to *579 mark them down. [3] Petitioner states that those laws typically required petitioner to retain sufficient spare parts to satisfy all repair demands for periods up to 7 years after the date of the last sale of the related consumer product. Petitioner further states that those laws obligated petitioner to provide, upon request, spare parts within as few as 30 days and that petitioner would have been unable to meet such deadlines if it relied on importing such spare parts. Be that as it may, we conclude that the consumer protection laws in question are of no special relevance here. Their consequence is no different than that of market forces that could, in effect, require petitioner to carry an inventory of spare parts for a given period of time. In either case, the regulations require objective evidence of market value before a write-down is permitted. That, petitioner has failed to produce. *580 Conclusion
In sum, we will grant respondent's motion for partial summary judgment filed March 2, 1992, on the four issues we considered here; we will deny petitioner's cross-motion on the three issues for which it filed a cross-motion for partial summary judgment. We also have before us respondent's motion for partial summary judgment (styled as a cross-motion), filed May 21, 1992, and directed at what respondent characterizes as petitioner's claim that, for purposes of the "lower of cost or market" method of valuing inventory, petitioner overstated by 25 percent the cost of its spare parts inventory. See sec. 1.471-3(a), Income Tax Regs. If, indeed, petitioner has made such a claim, it is not set forth in the petition or in any amendment thereto. We do not believe that it is an issue in this case. Accordingly, we will deny respondent's motion filed May 21, 1992. Of course, the parties are free to address that issue at trial or otherwise. An appropriate order will be issued. Footnotes
1. The amount here stipulated as a deduction for the taxable year ending March 31, 1983, is $ 1,250 greater than the amount the parties otherwise have stipulated that petitioner deducted. We cannot explain that discrepancy and leave it to the parties to work out, as necessary, in the Rule 155 computation.↩
2. A second special rule, of no application here, applies where the merchandise itself is defective. See sec. 1.471-2(c), Income Tax Regs.↩
3. Petitioner cites the following consumer protection laws: Conn. Gen. Stat. Ann. sec. 42-110w(b) (West 1987); Ind. Code Ann. secs. 26-2-6-2, 26-2-6-3 (Burns 1974); R.I. Gen. Laws Ann., sec. 6A-2-329↩ (Michie 1985).